23-5083 State of Georgia and Brad Raffensperger, Georgia Secretary of State, in his official capacity v. United States Department of Justice, at balance. Mr. Sandberg, for the at balance. Ms. Thate, amici curiae, in support of the at balance. Mr. Sherr, for the appellees. Good morning, counsel. Good morning. Mr. Sandberg, please proceed when you're ready. Good morning, and may it please the Court. Jeff Sandberg for the United States. This case is about whether FOIA Exemption 5 applies to attorney work product shared among DOJ and allied counsel pursuant to common interest agreement. Exemption 5, of course, requires both that the records be privileged and that they be intra-agency. This Court has not yet addressed the intra-agency condition in a case like this one, where the agency function is litigation before another branch of government, rather than an activity that culminates at the agency itself, such as regulation or adjudication or some other process. This Court has made clear, though, in other contexts that the term intra-agency, at least specifically as it is used in Exemption 5, is best interpreted pragmatically, so that the intra-agency concept turns not just on whether the author is an agency employee, but instead on a common-sense judgment whether the records at issue are sufficiently connected to and aligned with the agency function such that they merit being deemed intra-agency. We think the considerations that led this Court and other courts of appeals to adopt that functional reading of intra-agency in the consultant context apply with even greater force here. Here, uniquely, DOJ is functioning as a litigant that must play by the same rules as other parties and is subject to the Court's supervision. As the government's lead litigator, we often find ourselves in multi-party litigation of all kinds, in which there end up being interveners or other parties on the same side as us, whether we would like them to be there or not. The District Courts supervising multi-party litigation often encourage us, or as in the underlying litigation here, actually require us to litigate jointly, whether it be through jointly conducting discovery or, as here ultimately happened, making joint filings, where DOJ and interveners' counsel or aligned co-parties' counsel have to co-author and sign the same brief. Now, that approach is— Can I ask you this? So, there's obviously—understand your submission that it's not fair and it doesn't make sense to use FOIA as a way to get the other side's materials if you couldn't get the other side's materials in the litigation itself because of the work product privilege. And I'll assume, for present purposes, that everything here is covered by work product. And let's put a side waiver. Let's just assume it's actually covered by—it would be covered by the work product privilege in the underlying litigation itself. And then your submission is, well, you can't use FOIA to get around that and allow the opposing side to get their hands on strategy materials. I understand that. The question is, in my mind, is what work is the intra- and interagency part of the statutory provision doing in the way you're looking at it? Because the work product privilege definitely covers circumstances in which the attorneys, for a side, share documents with other attorneys that are roughly on the same side. There's no doubt the work product privilege covers some of that. Then the question becomes, is your submission at the end of the day that everything that's protected by work product in that context also should be treated as intra-agency for purposes of FOIA? Or are you seeing intra- agency to do some work that would limit the extent to which the work product privilege would work in the FOIA context? It does do some work here. I do want to take a step back, since this is a new context, a matter of first principles. The inter- or intra-agency functions across the breadth of what Exemption 5 has to do. So we know from Klamath and this court's recent decision in American Oversight that intra-agency has meaningfully chips away at the government's ability to withhold as deliberative materials submitted by outside parties that have a stake in the agency process. In the context of common law litigating privileges that everyone can enjoy, not just governmental privileges, we think that intra-agency continues to function, but it's not going to have the same sweep because the concern that Congress was getting at in including intra-agency does not exist to the same extent. For work product, okay, so the work product privilege, as this court has explained in AT&T, which is the case that everybody in this case, including the district court, relied on, said that the attorney work product privilege is not readily waived. It's only waived when the work product is likely to reach an adversary or a conduit to an adversary. So that means that the government could share its work product with parties with whom it doesn't have a common litigating interest, and it wouldn't necessarily waive that privilege. But here, we think that intra-agency does impose discipline on us to say that the agency has to duly decide that it is necessary for the co-litigants to be essentially part of the agency's litigating team in order to successfully carry out this litigation. And that is, you know, at common law, the way you do that is through a common interest agreement. And so we think the best reading of intra-agency requires us, you know, the attorney general and his delegees, to make a determination that— So the work that's done is, if you cabinet to common interest for purposes of FOIA, that's narrower than the sweep of the work product privilege. That's right. Basically, the way you're looking at it. That's right, in the context of work product. I would note, you know, there's other privileges too, attorney-client privilege, where attorney-client privilege is waived unless there's a common interest in place. And so there, it might be co-extensive, but I think that's just, it speaks to the fact— So there's still going to be situations then under, part of the force of your submission is, look, it's just not fair. And it doesn't make sense if FOIA can be a way for the other side to get their hands on our notes. That's right. And that's not— But even under your view, that's going to happen sometimes because there's going to be situations in which it's beyond common interest, but still protected by the work product privilege and therefore accessible under FOIA. That's right. And that's, you know, the Congress used the word intra-agency in there. It should be given independent vitality where possible. We recognize that. The government has to be, you know, it has to make a determination that it is necessary to its litigating function in order for it to come— And how does that map on? You mentioned the purpose of the words intra or inter-agency. What is that purpose and how does this line map onto that purpose? Well, the purpose is, you know, I think what Congress was getting at, it said inter-agency or intra-agency. So it was in some sense trying to cover the waterfront of documents that are legitimately within the government, right? And the agency, of course, is an entity. It has to act through the persons who it invites to participate in its functions, whether that be on a permanent basis as employees or on an ad hoc basis as a consultant or co-litigant. And we think that intra-agency is getting at the concept that it embraces materials that are essential to the agency's conduct of its mission. And it's ultimately a line drawing exercise that looks a little different depending on the context or the privilege at issue. Again, here we're talking about an agency that has made up its mind about what it thinks the right answer is, but it doesn't have the last word on whether the Election Integrity Act violates the Voting Rights Act. It has to litigate in court. And in this case, ultimately, you know, Georgia objected to the private party's ability to file a separate summary judgment opposition from us. We filed a joint summary judgment opposition because Georgia insisted, and the District Court in Georgia agreed, that we should have to coordinate to make things easier for, among other parties, Georgia. So I understand the argument that work-product privilege should be treated different. But just to step back, am I understanding correctly that essentially if we thought we were supposed to apply the test that American Oversight sets out, that at least your primary argument is that we shouldn't apply that test in the same way. Is that correct? That's right. We think that this is, as Georgia itself argued in District Court, this is a meaningfully different context from the consultant context. And there are other applications of intra-agency that just don't fit within consultant, like documents exchanged with the President or represented parties. So how do you distinguish Klamath? Because Klamath did involve work-product privilege, and it did involve exactly the dynamic Judge Srinivasan is hinting at, where documents that would have been protected as work-product, including under common interest privilege, were required to be disclosed under FOIA. Klamath was predominantly, I remember the footnote that Your Honors must be recalling as well from Klamath. There were a couple of documents that were work-product, but the thrust of the Court's analysis there was on the deliberate process privilege, because it was documents submitted by... I don't think that's quite right. The background says they invoke deliberative process privilege and work-product privilege. Right. And then proceed to conduct a singular analysis of what it means to be intra-agency. I think Klamath's analysis, when you get to the legal reasoning, is focused on the documents submitted by the consultant to the government, which the government in that case withheld as deliberative process privilege. The work-product privilege in that case, if I recall correctly, was something that the Department of Interior had sent to one of the tribes. The real thrust of that opinion, as it has been interpreted by this Court since then, is about the material submitted by the consultant to the government, when the government was still making up its mind, both in an internal adjudication, as well as potential participation in a state court lawsuit, as to what position it was going to take. And here we're talking about the Department of Justice... Are some of the documents that have been withheld here documents that were prepared by non-governmental parties? Yes. That's what the amicus brief says. Right. So in Klamath, the brief especially makes very clear that some of these documents must be withheld based on work-product privilege. It cites state common interest law and complains about the fact that this is going to put the tribe at a disadvantage. It just really echoes a lot of the arguments you're making today. And I just wonder what the distinction is. We're also talking here about interagency, of course, but what matters is what the Supreme Court said in its decision and not what the party said in its briefs. And what the Supreme Court was focused on was a line of cases, which at that point included only consultants. No one had thought, possibly dreamed, of seeking the Department of Justice's attorney work product by the time 2001, when Klamath was decided. And so what the Supreme Court said is, look, we're not going to definitively... We're not going to give a definition of interagency. We're not even going to decide whether the consultant application is definitively correct or not. We're just going to say that the views are sufficiently divergent from that of the agency when you're lobbying the agency, that that doesn't fall within the consultant corollary. And the Supreme Court was just citing a line of consultant cases. It wasn't thinking about whether the president is an agency, whether represented judges or members of Congress would be an agency. It just did not attempt at all to address the situation here. And I think the Fourth Circuit got it right in saying Klamath just doesn't speak to these circumstances. It's important to look at this as a matter of first principles. And one of the arguments that I think the other side makes is that Klamath did involve the context of litigation, and they weren't just sort of aligned parties like we have here, but the government was acting as trustee and had fiduciary obligations. And what the court says about that is that it's not that simple. What matters is that the Klamath tribe in communicating with the Bureau would be pressing its own view of its own interest, even if they were completely aligned in that state court. Right. So the government's argument was that the deliberative materials submitted to the Department of the Interior by the tribe saying, give me more water, even if it comes at the expense of others, that the government couldn't withhold that simply because it had a trust obligation to the people sending those letters. But again, that was in the context of deliberative submissions into an agency decision-making process. Here, the Department of Justice made up its mind. It took a while. It was the last one to file a suit, but it decided that the Attorney General decided there was likely a violation of the Voting Rights Act here. And so then it's a question of how do you operationalize that. DOJ, unlike other agencies, doesn't get to just wave a wand and make it so. It has to litigate in court. And the reason why courts' approach to multi-party litigation has been possible is because for as long as the work product privilege has existed, going back to Hickman, it has protected the ability of lawyers on the same side of the case to consult with one another in trial preparation. And we know the work product privilege is one of the privileges Congress specifically had in mind when it enacted Exemption 5. And interpretive principles tell us we ordinarily presume that Congress intends to go with rather than fly in the face of that common law backdrop. So I think the question is, did Congress displace the well-understood understanding of the common law privilege by using the word intra-agency? And even under your view, it did to some extent. Yes, to a very small extent. It needed to be, you know, in some sense functionally essential to the agency's mission. But we do not think that Congress displaced this important application of the common law here. And all of the available tools of statutory interpretation and available evidence cuts in the government's favor here. I mean, you'll look in vain in my opposing colleague's brief for anything other than an assertion that, you know, the term intra-agency in the ether should be read as limited to agency employees. Congress, and there's no indication that Congress in 1966 intended to incorporate the, to protect the working papers of the agency attorney, only so long as they remained in the hands of agency employees. And certainly in 2016, when Congress set about to try to fix all the problems it perceived with FOIA, including problems with Exemption 5 specifically, particularly the deliberative process privilege, Congress at that point would have known from, you know, the case law in many circuits that courts had given a functional interpretation to intra-agency where it's not limited to employees, that the Supreme Court had, although not affirmatively blessed, the Consul in Corollary and Klamath had assumed its validity. And moreover, the Fourth Circuit had held in Hunton and Williams that the common interest rationale was valid here. And this court has said when Congress, you know, when Congress sets about to fix things that are wrong with the statute, and it's been interpreted in a particular way, that as a matter of textual interpretation, ratifies the interpretation has long been given. Congress thought nothing was broken. About the common interest notion, just as a practical matter, I understand that the common interest notion has practical salience in the attorney-client privilege context, which it's at least in my limited experience is where it often comes up because parties want to make sure that by sharing documents, that's not going to afford an avenue for piercing the and there's cases that discuss it in the context of the work product privilege too, including our cases, but what practical work does it do? Absolutely, just divorce it from the FOIA context. In litigation, what does common interest have to do with the work product privilege if the work product privilege actually extends beyond common interest? Right. The right answer, and if you look to the treatises, it'll tell you this, that there's cases on both sides of it. The right answer is that the common interest doctrine is a defense to waiver of the attorney-client privilege. It is not, and it essentially marks the line there. If you have a common interest agreement, that's sort of a slam dunk for the work product, but that is not the bounds of the work product. Right. So what is it doing in the work? I mean, it's, it makes it clear that there hasn't been a waiver in the work product context, but it's not actually defining the meets and bounds of the work product. That's right. But we do think that it defines the meets and bounds of intra-agency in this context. And so that's why there's a meaningful, that's why we're giving meaningful independent work to intra-agency here. The, what gets confusing is that in talking about why there hasn't been a waiver of attorney work product privilege, courts often think about, well, you know, if the question is, is it likely to reach an adversary? And then that means is the person, is the recipient likely to give it to the adversary? And if the recipient has common litigation interests with the, with the disclosure, disclosing party, then it's fair to draw the inference that even absent an agreement, even absent a meeting of the minds, that the privilege has not been waived here. So we're saying, look, the department needs to duly determine that it is necessary to the litigating functions of the United States to essentially, to a significant extent, bring these other folks onto the agency litigation team. I mean, that's just to fulfill our statutory obligations under 516 and 517 of Title 28 USC. We need these people to be collaborating with us. And then, you know, the court ultimately ordered us to do it. Now, Georgia has been very careful to try not to request any documents from that post-consolidation period, but they have never denied that the logic of their statutory interpretation would clearly reach documents that were prepared because the court ordered us to join. I know I keep harping on this, but I just want to make sure I have your position. It's you, you're, you're accepting both sides of the common interest divide. The department's position is if the documents are, are within the fold of a common interest arrangement, then they're off limits for FOIA. But if they're outside a common interest arrangement, then they're within FOIA's disclosure obligations, even if they would be protected by the work product provision. That's your- That's right. That is the line that Judge Wilkinson drew in the Hunt and Williams opinion. And that is, we think, ultimately the right line. And, you know, there, there was a remand in that case to decide whether the initial conversations between research in motion, the makers of BlackBerry and the DOJ commercial litigation branch had been pursuant to a common litigating interest or not. And there was an ultimate ruling in that case. We don't know how it played out, but, you know, the suggestion was until there is an agreement and meeting in the minds to litigate together, not necessarily as co-parties, because in that case, the government hadn't even intervened yet. But until there's that, you know, agreement to involve the outside party as part of the agency litigation team, then it's, it's, it's hard to see how that's intra-agency. And when did that happen here? That happened here at least by July 28th. And there was a phone call where all the parties talked to each other and agreed orally to, you know, a common interest arrangement that was then memorialized in an email shared with all parties that you can find. There's a couple of things, there's a couple of things that are withheld that are before that. I think there's a couple of emails that are before July 28th. There's one email from earlier in the day on July 28th, and there's one email from the prior day. They're in the same thread. The email from the prior day is headed common interest communication, and it sets out an agenda for the following day's call, which is about forming a common interest agreement. We, the district court here said that it thought that the common interest agreement, although, you know, looming was, was still in co-it and hadn't been formalized. We think that it's sufficiently bound up with the common interest agreement that was contemporaneously finalized that we can withhold it. But if this court disagrees, you know, we're, the more important principle we're trying to vindicate here is once that agreement has been made, and no one can deny that it has been made, we should withhold from that point forward. So if at the end of the day, those are two documents we had to let go, we could live with that. But we do think that they were legitimately withheld as common interest communications. Two days. The dividing line for you is when was the agreement consummated? Well, it's, it's primarily when the department determined that it was necessary to, to litigate in common with the other parties. But yeah, then the other party is confirmed. They also understand themselves to be litigating with common and not as an American oversight, divergent interests. I should note as well that two days before the email memorializing the common filed a statement of interest in one of the other cases that had been filed much sooner. And there was already a motion to dismiss pending. And we popped in to say, look, we, we care about how the court construes the voting rights act. In this case, we have a case of our own. So, you know, we know as of July 26th that the government already was saying, we have our own case. We care about how these cases are resolved. The July 27th email setting up the common interest phone call was, you know, in the wake of that, again, if, you know, we think it was all properly withheld, but the most important thing is that the materials after July 28th are in dispute. But I just want to understand what is the principle? Is it when an agreement has been reached or is it because you could say one thing you said was the government filed a statement of interest. So that's the government's indication that it cares. You could say the same thing about the government's filing the lawsuit in June. That's an indication that the government cares about the subject matter area, but that's just the government sentiment. It doesn't have necessarily something to do with the other, the other parties. And so what is the, what is the rule that you'd be looking for when the common interest arrangement has congealed enough that it fits within the work product privilege to an extent that FOIA doesn't allow piercing it? I think that at a minimum, once the other parties to the common, you know, the other parties litigating on the same side of the United States have agreed with the United States, yes, we're all to some extent on the same team here. We are going to, you know, we have 60 depositions to use among us. How are we going to allocate them? What document requests are we going to produce? What evidence do we need to file a PI motion? You know, once both sides have agreed that they're on the same team, that, that once both sides agree they're on the same team, that's the way you'd look at it. Okay. I think so. But how does that have to be manifested? Well, no one, no one in this case has argued it has to be in writing. And I think that's right. Hunt and Williams said, you know, an agreement doesn't have to be written, but an agreement there must be. We happen to have a written memorialization of a common interest agreement here that happened on a phone call. And I don't understand my opposing colleague to be arguing otherwise. They have said that they think that the agreement is insufficient because they think for whatever reason that there's not a common litigating interest in litigating the same claim before the same court against the same state law on the same schedule. But, you know, the agreement existed as of July 28th. I think we can. So if you had a memorandum to the file, which simply said, you know, an attorney by name from the Department of Justice has spoken with the attorneys from these six other lawsuits, and everybody agreed that there was a common interest here whereby they should file. I don't know how detailed it has to be, but file jointly in their challenge to the statute. Yes, that would be sufficient. And of course, in a FOIA case, the government has to come forward with declarations that state, you know, the basis for why it's withholding the document and why it believes it to be both intra-agency and privileged. And so we get a declaration from someone who say, you know, I wrote this memorandum to file and I can also speak directly from my own experience and knowledge that I had this conversation with the counsel. In response to the chief judge, your point was clearly when there's a written agreement, it's easier to determine that there's common interest. But there may be previous communications which are also sufficient. That's exactly right. I mean, this comes up in so many different contexts, you know, the False Claims Act, where there's a Relators Council and Government Council and, you know, the best practice is to try to memorialize this as soon as possible in writing. But these conversations can happen when one person picks up the phone and calls the other and they agree on the spot that they're, you know, litigating together. And so I think it would be, you know, impractical and there's not really a, you know, a strong basis for requiring any particular procedural formality to this. The point is that the agency has decided, okay, you are, you know, for purposes of this agency project, which happens to be litigating before the federal courts, you are part of the team here and we can share but don't have to share privileged material with each other. And our adversaries, you know, and I think, you know, our co-parties in this case, you know, relied in good faith on the government's representation that the other side wasn't going to be able to litigate on wits borrowed from us, you know. No, I heard you say that, but then I thought in response to the chief judge's question, you backed off of that. That it's not enough that the government has decided that the public interest is such that these seven parties ought to work together. That's right. That's just the, yeah, the most salient point, I mean, the question here is whether this is intra-agency, right? We're looking at things from the agency's perspective. So the Department of Justice saying you need to be part of this litigating team is the most important thing happening here. And then I recognize secondarily the fact that the other parties said, yeah, okay, that's what, you know, we are not, we do not have divergent interests. We are not, as in American oversight, negotiating or advocating with each other. We are figuring out how are we going to structure discovery? What witnesses do we want on our side? Who do we want to depose? What document requests? And then ultimately, you know, co-writing. So is that true? I mean, I would think in a large defense or plaintiff group, I would describe exactly what goes on as negotiating. You are trying to persuade each other to proceed with the litigation in the way that each distinct lawyer who's representing a distinct client thinks is the right way to proceed with the litigation. It's not as if you're now all, you know, magically aligned and don't have distinct interests. You're trying to influence each other to get to the best result, yes, but it's still deliberative in a sense, isn't it? Your Honor, it's, once you're in a common interest agreement, it's moved from the point of having different interests to just talking about strategy. A common interest agreement would be pointless if the parties already agreed about everything to do. You know, if the whole point of this is to streamline, to get on the same page, to make one filing, the common interest agreement presupposes. The thing that I go back to is, so the American oversight opinion gives this example of a health insurance company that says we are completely and totally aligned with the administration's healthcare reform goals. We want to see exactly, you know, at some level of generality, the same kind of bill go through, but that opinion says that that company is never going to be regarded as intra-agency because it has a distinct stake in what the agency does, and I'm not sure why you wouldn't say the exact same thing here. Other parties have a distinct stake in what DOJ decides to do and in the outcome of the litigation. So if I may, Your Honor, let me elaborate on that hypothetical with two alternatives. Alternative one is the United States is litigating in federal court the, you know, constitutionality of that law and the hospital or healthcare center, sorry, I forget what it is, has intervened and we're on the same side and we're litigating together. And in that context, we think it would be any work product exchange would be intra-agency. Now let's just say that we agree and we have good ideas, you know, we have similar ideas and we want to be in dialogue with, you know, the regulated industry about what's going on here. What the only privilege that I think could conceivably apply there, if any, would be the delivery process privilege. The privilege there itself would be dubious, but, you know, I certainly think certainly the intra-agency would do some work there because you have the hospital. This is outside any recognized common law context where cooperation is legitimate, right? We're talking about the government as policymaker and as regulator. I just think that this is so meaningfully different. We're talking about litigation before a federal court and we just know so clearly that Congress intended to sweep in the common law work product privilege that just as a matter of statutory interpretation, the term intra-agency has to be given a pragmatic reading that will achieve Congress's purpose of ensuring that Exemption 5 does not function as a ready circumvention mechanism. I mean, it's been a while since the Supreme Court has had occasion to repeat this, but it said in the Weber Aircraft case that it's consistently rejected any reading of Exemption 5 under which FOIA would become a ready pathway to backdoor discovery. And it's, you know, no court before this court and the district court in this case, in the few cases that this has ever come up, has ever thought that these documents would not be protected. So I've already pointed your honors to the Hunt and Williams opinion. Even the dissenting judge in that case I think would have found the intra-agency, you know, condition satisfied here where we're talking about co-parties. But there are a variety of other district court decisions that we laid out in two pages of our brief in a very long string site in which courts have recognized this. And so I don't think, you know, to the extent there's any novelty about this case or discomfort about how it feels different than Klamath or American Oversight, I think that's just simply a product of the fact that no one had ever thought you could get, I mean, very few people ever thought you could get the Department of Justice's work product shared with allied parties through the mechanism of FOIA. So that certainly the burden of any kind of novelty here does not fall on the government. Let me make sure my colleagues don't have additional questions at this time. We'll leave a little time for rebuttal. Thank you. Thank you. Ms. Thatte. Good morning, your honors. Anusha Thatte on behalf of AMICI. As you all know, AMICI are legal organizations co-litigating with DOJ in the underlying FOIA action and whose privilege litigation strategy communications are what is at issue in this FOIA appeal. We do appreciate the opportunity to address the court today. And I, of course, welcome any questions you all might have. I would propose to use my time to focus from our perspective on, I think, two key issues. Number one, I would like to speak to the convergence of interest issue and our reliance here on longstanding common law privileges. And then number two, I would like to take a moment to underscore what we feel are really untenable implications for judicial economy and the conduct of multi-party litigation more generally. Should FOIA somehow be allowed here in this new context to be used as a backdoor for the kind of privilege litigation strategy communications we're talking about? Turning first then to our convergence of interest and reliance on common law, to reiterate what my colleague recently said, that the purpose of Section 5 is, as the Supreme Court has held, very clearly to protect those communications normally privileged in civil discovery. And I think there's no dispute that's what we're talking about. And what we're talking about solely are communications with DOJ after DOJ filed suit. So these are not, again, communications that Georgia could have obtained in discovery. I'm trial counsel in the Georgia litigation. They have not tried to obtain these communications through discovery, I think rightfully and understandably so. And so to get at some of the discussion earlier, this case is not about lobbying an agency to take action. DOJ had filed its lawsuit and that's what's basically the distinguishing factor between all of the cases on which Georgia's relying, on which almost all of the cases have really been adjudicated to this point. So again, this is again about the straightforward context of post-litigation communications. So can I ask you about that? So you're representing one organization, but there's an umbrella of organizations that are involved here. And you cited an interesting case in your brief, the lawyers' committee versus DOJ case. And in that case, one of the organizations here tried to get at documents that DOJ had, and that had both delivered process and work product in it. For present purposes, let's just assume a way to deliver the process. And let's just talk about work product. Under your view, was a lawyer's committee's efforts to get those documents just wrong under the work product privilege? Because it seems to me a lot of the same arguments would apply here. It was getting at strategy documents. It was after the government had decided that they were going to align themselves with the, I think it was a state there, I can't remember exactly who it was. But, and then there were documents shared back and forth about strategy before the tribunal, the Supreme Court. And then, but the lawyers' committee tried to get at those documents. And I take it that your submission now though would preclude that. Thanks for that question. I think it's a very good question. Of course, lawyers' committee is one of the amici organizations here on whose behalf I'm speaking. And so that case, I think a couple of things. One, I obviously can't speak specifically to the strategy there in that case, but it is distinguishing in some circumstances because it's not, it wasn't a co-party situation. It's a little different. It was a solicitor general submitting an amicus on behalf of a state and the state's pending action. So I think factually there's obviously a distinctive scenario there, but I think- Would you actually draw that distinction? So you think that when the United States government decides that they're going to file on the same side of the state, and then has collaborative discussions with the state about how they're going to present oral argument, that that's still something that FOIA allows the other side to get their hands on? So I think more to your point, your honor- Because they're not co-parties, they've decided that they're going to argue on the same side and they're going to present argument together. Your honor, I think very frankly, looking at it now, I think we disagree with the approach taken in that case. I think the one thing I do want to say is that here, I don't think we have a close call because we are talking really about co-parties. I think the question about convergence, about common interests is probably a different question when you consider a case like that. But I do think here under the principles we're articulating here, it should probably rightfully preclude discovery under FOIA of those communications as well. But again, like I was speaking to here, there is no real distance in the way that that case might have presented what we're talking about are essentially co-litigants. And I think it's obvious here why we as co-litigants relied on common law privileges that were almost universally well-recognized here. And I think it's also, again, why the district court ordered consolidation, why we've proceeded jointly at discovery and briefings at hearings, including because the other side has objected to us filing separate briefs on occasion. And so again, we fully expected in this circumstance that basic privileges should apply. And I really do think that that is the only tenable answer both under the text of the statute and under the practical implications you all have been speaking to today. And I did want to speak briefly to the point about disinterestedness in the American oversight decision because, of course, that ruling came down after we had filed our supplemental brief. And in essence, I think we agree with the explanation that the Department of Justice has given in drawing this distinction between deliberative process cases and cases where, as here, the Department of Justice, the litigating function, its function is to litigate. It has made its decision to sue. And therefore, after that, has brought in third parties in order to carry out that litigated function. And so we, again, think that it's pretty much a square peg in a round hole to impose a disinterested requirement in this context. Which is the words that were used by the dissent in American oversight. Yes, Your Honor. I don't know if that's where I got it or not, but I think it's the right explanation. And to be clear, we obviously represent our own clients. We are not suggesting that we are consultants. We are co-litigants. And in any common interest scenario, that's the whole point of the common interest agreement is to be able to exchange ideas, be a sounding board in the context of representing different parties. And that's the perspective that we're entitled to share with co-parties. And so, again, as with any statute, Congress should and must be presumed to legislate in respect of basic common law principles. And we think that applies especially so here when the whole purpose of Exemption 5, as I think there's no dispute, is to protect basic discovery privileges. Is it that the deliberative process privilege is a basic common law discovery privilege, right? Certainly, Your Honor. And I think, I frankly think the American oversight line of cases is appropriate when it comes to talking about the deliberative process privilege because the question there, the question of course motivating the enactment of FOIA is when you're in the lead up to a governmental decision, the public should be entitled to know about lobbying efforts. But I think that's a distinctive scenario than when you're talking about the set of privileges. We're talking about litigation privileges where once the government has made its decision for the DOJ, the decision that the DOJ makes is to be sued, or I guess, or to sue, or if their defendants, when they get sued, what to do about it. And so I do think that it is a very different calculus and to shoehorn the intra-agency analysis in the same way and in both sets of circumstances just doesn't work for, I think, the reasons that other courts have recognized. I'm sure my colleagues don't have any additional questions for you. If I may, Your Honor, just very briefly speak to the practical impact that we hope to get to. If you can keep it very brief. Sure, very brief. So again, the outcome that Georgia seeks, I think, would not only unfairly disadvantage DOJ and allied parties like us, but also severely harm judicial economy. In this case and elsewhere, of course, especially multi-party litigations, courts want and should want parties to be able to streamline their proceedings, their papers, their discovery, and indeed opposing counsel prefers that as well. And I think the implication that this type of material would be discoverable under FOIA would severely upend if not preclude that entirely. Thank you, counsel. Thank you, Your Honors. Chair. Good morning, Your Honors. Gene Scher representing the state of Georgia and numerous public officials in Georgia. We've heard a lot today about the work product doctrine and waiver and those sorts of things. And as I'll explain in a moment, the court doesn't need to reach those questions because DOJ's attempt to invoke Exemption 5 fails at the threshold internality requirement as made clear not just by the statutory text, which I think it's important to focus on, and by Klamath and by the recent American Oversight decision. But DOJ's argument fails for all of those reasons. As Judge Garcia indicated in his a little bit earlier, but before I get to that, I'd like to step back for just a moment and talk about why this case is important to Georgia and its public officials and its citizens. And that is because as the Supreme Court said in Klamath and in the context of interpreting Exemption 5 and as this court implicitly reiterated just a few months ago in American Oversight, FOIA's dominant objective is disclosure and not secrecy. And here it's especially important to Georgia and its citizens and public officials that DOJ not be allowed to keep secret whatever communications with outside groups may elucidate its decision not only to sue Georgia and its public officials, but to defame the state's elected officials by falsely accusing them of acting in a racially discriminatory way, for enacting a voting integrity law that by all fair accounts has not in fact suppressed minority voting as DOJ claimed it would, but has led instead to increased participation in voting among all demographic groups. So I understand why you've started there, but I take it the way the government, the federal government would respond is to say what this case is really about is not about that. It's about whether you can get your hands on our strategy. And so just just focusing on that for a second, under your argument, if the district court in a litigation like this says I need everybody on that side to come together on one brief and that brief's the motion, let's just say it's a motion, is going to have to be 50 pages combined. Right. You all work it out, figure out how you're going to do it, but that's all you're going to be able to do. And then the parties get together, I think something like this happened in this case. The parties get together, they have notes back and forth. Here's what we want to prioritize. Argument A really works for me. Argument B, I think we can suppress. We've got to come together. They share all kinds of back and forth about the interstices of the strategy that they have. Your view is that the other side gets to come into court under FOIA and get their hands on all of that while the litigation is ongoing? If they create records that are subject to FOIA, then yes, but there's no requirement that they create records as part of that process. They can go through that process in a Zoom call. They can put up a PowerPoint. They have to do everything orally. I'm sorry? They have to do everything orally. They can't exchange emails about strategy. Well, if they exchange email about strategy and they don't satisfy the internality requirement, then they're going to have to disclose them. That's correct. Right. That's quite breathtaking. Email, you know this better than anybody. Email is the point of the realm for lawyers engaging in business all the time and they attach documents. They're going to exchange drafts and they're going to exchange comments about how we're going to strategize for oral argument. All of that, the other side gets their hands on in the course of the litigation that's going to amazingly benefit them at the expense of the side they're litigating against because FOIA uses the term intra-agency. Well, and that is the term that FOIA uses, right? And I think that's a good place to start. Yes, it may be that in light of the American Oversight ruling and Klamath, if they were taking Klamath seriously, they may need to do things a little differently than they're doing. The only way they can do things differently, just so I prevent the other side from getting their hands on it. Well, or by Zoom calls or by shared documents. What I mean by Zoom is, if you share documents on Zoom, I wonder about that because the documents are actually there. So, if they don't get downloaded to the agency servers, they're not an agency record, right? So, if it's a 50-page brief, then what they need to do is they need to have a conference call or a Zoom call. I'm including Zoom within calls because the oral video interface, but the point is that they can't actually exchange comments on the documents by marking up the documents. They can only say in a call. So, rather than saying, I'm going to send you my markup, they have to say, I can't send you the markup because that's going to be FOIA-able. So, let me go through and describe to you orally the 50 pages of stuff that I have for you on your document. They certainly can do that, and it's not unusual for government litigators to litigate with an eye towards FOIA, and it's not unusual for people working with the government to litigate with the recognition that what they provide to the government may become a government record that is then FOIA-able. But my point is, Georgia's purpose in seeking these documents is not so much the litigation. The litigation is going very well for Georgia. You know, their witnesses on the issue of racial discrimination completely fell apart at the preliminary injunction hearing, but Georgia and its citizens are entitled to know, did the Justice Department know at the time that it brought its lawsuit and in the process defamed Georgia and its public officials that they knew that case was going to fall apart? And that's the reason that we want these documents. I think the question in the case is, to the extent there are documents that speak to that issue that aren't work product, then FOIA allows you to get them. The question is, if there are documents that may or may not speak to that issue, but are work product, does FOIA allow you to get those documents for that purpose, even though there's a work product doctrine that says, as a general matter, the other side doesn't get to see your legal strategy? Well, let's start with the text of the statute, right? As applied here, the statute says that in order to invoke Exemption 5, the record at issue has to be intra-agency. What does that word intra mean? It means, according to the dictionary, it means within the agency. Okay, so on the plain text of the LDF and other parties working with the Justice Department are within the Department of Justice. So under the text, they fail. Would you say the same thing about American Oversight? No, I think American Oversight reached exactly the right result. Under the text? Under the text, yeah. And that's because everything you just said isn't true about that arrangement also? No, American Oversight held that congressional staffers were not within the agency that they were consulting with, and therefore rejected the application of Exemption 5. I mean, that's fair. I'm talking about the circumstances in which the consultant corollary still applies, even though it's dealing with people who are not formally within the agency. Yeah, and let's talk about the genesis of the consultant corollary doctrine, right? It goes back to Justice Scalia, who suggested in his dissent in the Julian case that, well, maybe we don't have to take this term intra-agency to be quite as literal as one might initially think. And he said, if someone like a consultant has what he called a government-conferred capacity, then that person might be considered as being within the agency in the way that, say, a paid consultant might be considered to be within the agency, or even an unpaid consultant might be considered to be within the agency, right? And then Justice Souter in Klamath sort of picks that dissent up and says, we're not going to decide whether the consultant corollary is valid, because it is still in tension with the text. But assuming the consultant corollary is valid, we will allow government agencies to, if they can establish that someone has a government-conferred capacity, and Klamath made clear that there was another condition that was essential too, and that is that the person who is claimed to be a consultant also has to have no independent interest in the matter at issue. And American Oversight was very clear about that. And so this case is really a much easier case than American Oversight. That independent interest idea. So I'm thinking of a situation in which, and we talked a little bit about this with Amica's counsel, a situation in which the federal government is presenting a case in the Supreme Court alongside a state. And I can remember situations in which your client, the state of Georgia, was on the same side, and the Solicitor General's office already decides that they're going to file a brief, and they've been granted argument time to argue alongside Georgia. And Georgia and the U.S. exchange records. They don't do it orally. They exchange records and emails about oral argument strategy. When the other side says this, here's how we're going to respond. I think their main point is going to be X. Here's how we respond to Y. Your view is that the other side gets to file under FOIA and get their hands on all that. And if FOIA were fast enough, they could get their hands on all that before argument. Right. And if you're concerned about disclosure, the better course would be to do it orally or on a Zoom call or with a shared document or something like that. You'd be fine with that. I know you understand the logical implications of this. Sure. And that would be true of Georgia. So Georgia's communications with the Supreme Court argument are discoverable, so to speak, under FOIA by the other side in preparation for that oral argument. Anytime you're dealing with the federal government as an outside lawyer, you know to be careful about anything you send to them, right? Because you realize it may well be FOIA-able. And so I don't think that's a big deal for lawyers working with federal government. You just kind of expect that. And it doesn't seriously reduce the efficiency of the collaboration or anything like that. You can still collaborate a lot and very effectively. And with Zoom and shared documents and other technology, it's even easier to do it now than it was 20 years ago and not create government records that'll be FOIA-able. So, Counsel, there would obviously be, as the Chief Judge is exploring, a lot of serious practical consequences to this rule in this context. In their brief, the government also suggested that ruling for you here would call into doubt whether communications could be deemed intra-agency in other situations, including where DOJ represents non-agency personnel in litigation. So if DOJ is representing a member of Congress under your sort of strict textual approach, those wouldn't be deemed intra-agency either. Did you have a distinction of those hypotheticals? Yeah, in that circumstance, it would not be deemed intra-agency. So there would essentially just be no attorney-client privilege at all where DOJ is representing non-agency personnel. Well, there may well be some other way of protecting those communications. And, of course, as your Honor mentioned in the American Oversight case, to the extent that this is an issue, it's something that can be taken up with Congress and they can amend FOIA. But there's no escaping the language of Exemption 5. It says intra-agency, which means within the agency. And, of course, the Supreme Court has so far at least... The government-specific argument on this is essentially that once a formal decision is made to litigate the case, that that's effectively bringing these outside groups onto the government's team. And so at least you can tell a story about how you would regard that as within the agency. Yeah, that's their argument. And it's a very creative response to American Oversight, but there's no textual basis for it. I mean, we heard the LDF just say, we are not part of the Justice Department, right? And it may well be that the enemy of my enemy is my friend, but it's a step much... It's a much longer step to say the enemy of my enemy is actually part of me. And that's essentially the argument that the Justice Department is making here. And that just can't be right and is not right under the statutory language in it, and it's not right under Klamath. Again, Klamath imposes those two necessary requirements that there must be a government-conferred capacity. Now, if DOJ had said to all these lawyers, we're going to appoint you as special assistant United States attorneys, and get your clients to agree to this arrangement, and you can represent both your clients, and you can work with us, and that would be a government-conferred capacity that they conceivably could do, but they haven't done anything like that here. Can I ask, why did Georgia not ask for the documents that postdate the consolidation? Well, as I mentioned earlier, our main concern is finding out why the Justice Department brought this lawsuit paired with such defamatory comments about the state and its elected officials. And we think those are likely to have occurred in the early stages of the litigation. If they're in their files, we obviously don't know yet exactly what's in these emails. But we suspect, again, at the trial on the preliminary injunction hearing, their star witness, who's a black Democratic senator who really disliked this law and opposed it consistently, and he offered all kinds of policy reasons why the law was wrong-headed, but when asked point-blank, do you think the Republican legislators who adopted this law were acting based on racism or any discriminatory intent at all, he said, no, I'm not accusing anybody of racism. It sounds like, from your perspective, the litigation is going perfectly well without getting your access to the documents. The litigation is going just fine, that's right, but the defamation remains. And that's what we'd like to be able to respond to. And so I'm happy to answer any other questions the court has. We haven't talked about Judge McFadden's alternative holding, which is that DOJ had not established a common interest at all. And so if that's the new test for determining whether an arrangement satisfies the intra-agency requirement, the threshold requirement of Exemption 5, there's an alternative holding from Judge McFadden that says they hadn't established that through sufficient evidence, and we think he was absolutely right on that, and that's an alternative ground for affirming. How would you define it if there were this common interest? I know you resist the proposition, but just for purposes of argument, if there were a common interest notion that were imported into this area to delimit the bounds of what's FOIA-able, notwithstanding the word product privilege, how would you define that line? Well, the case law typically defines common interest as an identity or near identity of legal interest, and that's not present here for a couple of reasons. First of all, this law, SB 202, that they're challenging, it doesn't just have a couple of provisions. It has 53 different sections of which DOJ has challenged, as I recall, two sections, and the other plaintiffs have challenged maybe seven or eight, but there's generally not overlap among the sections of this law that are being challenged, and to the extent there is overlap, the legal theories are different. For example, the two provisions that the Justice Department has challenged as violations of the Voting Rights Act are also being challenged by another entity called Vote America, but on different grounds. They're challenging those provisions on First Amendment grounds rather than on voting rights grounds, and it was for reasons like that that Judge McFadden concluded that even to the extent the common interest inquiry is relevant, DOJ had not established it here, and so that's an additional basis for affirming if the court wants to go that way, and so in sum, DOJ has failed to establish that the withheld records are internal to the agency or that the common interest doctrine applies, and although the court only needs to reach the internality point, failure on either of those elements is, of course, fatal to DOJ's Exemption 5 withholding argument, and the District Court was correct that the DOJ didn't establish either of those elements, and for all those reasons, the court should be affirmed. Thank you. Thank you, Mr. Chair. Mr. Sandberg, we'll give you two minutes for a rebuttal. Okay, thank you. I do have a few quick points I'd like to make. First, my opposing colleague's repeated suggestion of ways that the government could avoid FOIA by speaking on the phone, I think, tells you a lot about this case. FOIA is supposed to be about promoting transparency into the government, not getting the government to, you know, buy more Zoom accounts or not put things in writing. It's been clear from the start that even, you know, to the extent courts used to interpret FOIA exemptions narrowly, the Supreme Court tells us not to do, that Congress said it's narrowly as consistent with efficient government operations, and having to go through, you know, red line over a 50-page document on Zoom is hardly consistent with government operations. I think if, you know, if Congress really intended these documents to be produced, along the lines my opposing colleague is saying, he wouldn't be inviting us to find ways to avoid putting things in writing. Second, about the commonality of interest. The question here is about FOIA and the records at issue. The question is not whether the United States and NAACP, LDF are, you know, platonically aligned in all senses. We have our own lawsuits. They have their own lawsuits. We have our claims in this case. They have their claims in the case. The records at issue are about the 100 percent overlap, the claims that we are litigating in common. FOIA focuses on the records at issue, not whether, you know, in some greater sense the entities are, you know, best friends. I don't really understand my opposing colleague's suggestion that it's important to, as a matter of public interest, to get access to these documents here to find out why DOJ filed suit. If we had records about that, we produced it to them. We are only withhold, the records at issue here that are being withheld are from the common interest agreement forward. If there were documents, if there were conversations with NAACP before the U.S. filed suit, they would have them right now because we produced everything from that time period. I completely agree with my opposing colleague. There's no escaping the language here, right? But the choice is about how to interpret that language. We have reckoned with that language. This court has reckoned with that language many times in the consulting context and has said it has a practical interpretation that is sensitive to the agency function at issue. So if agency consultants, you know, including just people who the government files off an ad hoc email to, doesn't retain as an expert or anything, just files off an ad hoc email as in the National Institute of Military Justice case. If those people count as interagency, then certainly the department's formal determination that it's necessarily to partner in litigation with co-parties comfortably fits with an interagency. And the last point I want to make is just about the ordering of these two things. Look, they're both merits inquiries. This court can do the internality first if it wants to. But I just want to impress upon the court that if you take internality first, you need to sort of assume the strongest possible case for the government to be able to do this. And I think this case is basically the strongest possible case for the government to be able to do this. We're ultimately ordered by a court to prepare joint filings here. So, you know, I think these documents are clearly privileged. It's easy to get past that issue. We ultimately don't care what order the court resolves them in. But I think the fact that my opposing colleague is so insistent on asking this court to do the interagency question first is because it wants you to be blind to the fact that Congress would not have intended clearly privileged work product communications, you know, whether ordered by a court or, you know, extremely sensible for the government to be doing, would not intend those to be released under FOIA and would not be in, was not encouraging the government to take steps to evade putting that in writing. If there are no further questions, we ask that the judgment be reversed. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan; Garcia; Rogers